SANDRA LOVELACE and          )
STEPHEN LOVELACE,            )
                             )
            Plaintiffs,      )
                             )
v.                           )          Case No. 4:15 CV 1694 RWS
                             )
WASHINGTON UNIVERSITY        )
SCHOOL OF MEDICINE and       )
                             )
BARNES-JEWISH HOSPITAL,      )
                             )
            Defendants.      )
                             )

## MEMORANDUM AND ORDER

Plaintiff Sandra Lovelace ("Lovelace") alleges that Defendants Washington University School of Medicine ("University") and Barnes-Jewish Hospital ("BJH") (collectively, "Defendants") impermissibly retaliated against her under the Family and Medical Leave Act ("FMLA") and Missouri Human Rights Act ("MHRA"). Plaintiff Stephen Lovelace ("Mr. Lovelace") submits an accompanying loss of consortium claim. University and BJH submitted motions for summary judgment. Based upon a review of the record before the court, I will enter summary judgment in Defendants' favor.

# I. *Background*

Plaintiffs Sandra and Stephen Lovelace (collectively, "Plaintiffs") present several claims against Defendants. Lovelace alleges that University, her formal employer, improperly retaliated against her under FMLA for taking FMLA leave and under MHRA for complaining about being labeled as a racist and complaining about disability accommodations. Lovelace also pursues FMLA and MHRA retaliation claims against BJH based upon a joint employer theory. Lovelace voluntarily dismissed with prejudice her tortious interference with business expectancy and defamation claims against BJH. Mr. Lovelace brings an accompanying claim for loss of consortium.

The following facts in this matter are undisputed. Lovelace was employed as a Medical Assistant ("MA") by University in its Division of Medical Oncology from November 2003 until she was terminated on August 5, 2015. Generally, MAs perform hospital support tasks such as scheduling, answering phones, and placing orders. MAs may be assigned to assist a particular doctor's clinical team or "float" among different clinical teams. Lovelace worked for the clinical team of Dr. Nancy Bartlett from November 2003 until 2007 and for the clinical team of Dr. Steven Sorscher from 2007 until December 2014. From December 2014 until her termination, Lovelace did not have a specific permanent team assignment. Clinical nurse manager Paula Goldberg ("Goldberg"), an employee of BJH, supervised

Lovelace from 2007 until Lovelace's employment ended. Dee Brinkley ("Brinkley"), an employee of the University, was promoted to MA supervisor in September 2014, and also supervised Lovelace. Lovelace took FMLA leave twice, first in 2009 and most recently in 2014. Although the record includes references to Lovelace's prior performance, this dispute focuses upon a series of events occurring in 2014 and 2015.

On December 10, 2014, Lovelace was temporarily assigned to work with Dr. Douglas Adkins' team. That day, Lovelace left early because she was experiencing back pain. Lovelace was absent for several days. On December 16, 2014, Goldberg emailed Lovelace to suggest that she might need FMLA paperwork, copying the University payroll department for assistance. On December 31, 2014, Lovelace applied for FMLA leave, which the University granted. Lovelace periodically provided Goldberg with status updates during her leave. Although Lovelace initially planned to return from leave on February 9, 2015, she emailed Goldberg that morning to let her know that she would not in fact be able to return that day. Goldberg, Brinkley, and lead charge nurse Jodi Thole communicated their frustration with this late notice in a series of emails on February 9, 2015. In one of these emails, Goldberg stated, "I am fine with her burning up her time. If she has surgery then in a month I can hire someone else." Lovelace had back surgery on February 20, 2015.

Lovelace returned from FMLA leave on March 4, 2015. Lovelace was subject to work restrictions upon her return, including the need to take periodic breaks to stretch, walk, or stand. Lovelace was again temporarily assigned to work for Dr. Adkins' team. Another MA, Angela Butcher ("Butcher"), had been recently hired for Dr. Adkins' team, and once she had been trained, Lovelace began floating among different teams. From April until July 2015, Lovelace worked with Dr. Manik Amin's team, including nurse Deb Orf ("Orf"), several days a week. Over the next few months, Orf identified several performance and behavioral issues, including that Lovelace failed to adequately complete assigned tasks like scheduling, preparing paperwork, and checking phone messages.

In April 2015, Goldberg met with Lovelace for an annual performance evaluation. Goldberg and Lovelace discussed Lovelace's recent performance and her transition back to work following her FMLA leave. Lovelace was dissatisfied by her scores in the accompanying written evaluation, and later provided Goldberg with a suggested revised version. Goldberg authorized Lovelace's revisions, enabling Lovelace to receive a raise. In May 2015, Lovelace met with Bob Barczewski ("Barczewski"), a University Director of Business Operations, to voice concerns about Goldberg's treatment of her since she returned from leave. Also in May 2015, Lovelace met with human resources consultant Sandra Sledge ("Sledge") to discuss the possibility of finding a new job in a different division. At

various times, Lovelace sought placement as a MA on specific physicians' teams, but she was never permanently reassigned.

In early July 2015, Goldberg and Brinkley spoke with several nurses and physicians about Lovelace's problematic performance and behavior. Dr. Brian Van Tine allegedly reported that Lovelace, who is Caucasian, previously made a statement to the effect that Butcher, who is African-American, did not like working with white people. On July 10, 2015, Goldberg wrote an email to Sledge, summarizing various performance issues. Goldberg stated that she believed she had "enough" to fire Lovelace, but planned to provide a verbal warning only, and requested guidance. On July 13, 2015, Goldberg met with Lovelace and Brinkley to discuss these issues and provide a verbal warning. At this meeting, Lovelace was upset by the criticism conveyed, complained that she was being labeled a racist, and stated that she "was not letting it go." The following day, Lovelace met with Sledge to complain of the alleged racist labeling and FMLA retaliation. Sledge undertook an investigation of Lovelace's claims. Lovelace, displeased with Sledge's progress, reiterated her complaints directly to human resources manager Leanne Stewart ("Stewart") on July 21 and 24, 2015. With respect to the FMLA retaliation claim, Stewart ultimately concluded that there had been no change in Lovelace's terms and conditions of employment following her return from leave.

On July 31, 2015, Brinkley and Sledge scheduled a follow-up meeting with

Lovelace.  Goldberg was on vacation on this date.  Brinkley provided Lovelace with a checklist of MA duties to facilitate discussion regarding performance issues.  The discussion of performance upset Lovelace, so she asked to go home.  Sledge answered affirmatively and Lovelace left the room.  A few minutes later, Brinkley went to check on Lovelace at her cubicle.  In front of several co-workers, Lovelace jumped up and loudly told Brinkley, "don't touch me," "get away from me," and "you're evil."  Brinkley left to inform Sledge about the disruptive confrontation.  Sledge went to Lovelace's cubicle to tell her to go home, and threatened to call Protective Services.  Lovelace gathered several items and asked Sledge whether she was being fired.  Sledge responded that she was not.  That evening, Sledge wrote an email to Barczewski reporting the incident and advising that Lovelace be placed on leave.  On August 2, 2015, Barczewski called Lovelace to notify her that she was being placed on administrative leave.  On August 3, 2015, Stewart and Lovelace spoke about the incident.  On August 4, 2015, Sledge, Stewart, Brinkley, and Goldberg met to discuss how to proceed with respect to Lovelace, and agreed to recommend termination.  On August 5, 2015, Barczewski decided to terminate Lovelace.  He sent a termination letter informing Lovelace that her behavior in the July 31 incident was "not reflective of behavioral expectations."  He also called Lovelace to notify her of the termination.

Lovelace brought this suit following her termination, asserting that Defendants impermissibility retaliated against her for taking FMLA leave and in response to her complaints about the racism allegations and post-surgery accommodations. Both University and BJH submitted motions for summary judgment as a matter of law. To the extent that their arguments are substantially similar, I will address the issues together.

## II.    *Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an

affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004). The Eighth Circuit refuses to apply a heightened summary judgment standard to employment discrimination cases. See Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. banc. 2011) (holding that there is no "discrimination case exception" to the application of summary judgment, as district courts should not "treat discrimination differently from other ultimate questions of fact.").

In the absence of direct evidence of discrimination, courts employ the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Title VII case).[1] Under the burden-shifting analysis, the plaintiff must first establish a prima facie case of intentional discrimination. McDonnell, 411 U.S. at 802; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994). If the plaintiff establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. McDonnell, 411 U.S. at 802. The defendant employer need not persuade the court that the articulated reason was the basis of its action; rather, it must simply

---

[1]*See, e.g.,* Wierman v. Casey's General Stores, 638 F.3d 984 (8th Cir. 2011) (applying the McDonnell Douglas burden-shifting analysis in case involving FMLA and MHRA claims).

provide some evidence of a non-discriminatory reason or reasons for its action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). Upon the proffer of such evidence, the presumption of discrimination established by the prima facie case "simply drops out of the picture." Id. at 510-11. The burden then shifts back to the plaintiff to prove that the employer's explanation was really a pretext for discrimination. Wierman, 638 F.3d at 993. A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination. St. Mary's Honor Center, 509 U.S. at 511. "To survive summary judgment, an employee must both discredit the employer's articulated reason and demonstrate the 'circumstances permit a reasonable inference of discriminatory animus.'" Johnson v. Securitas Sec. Services USA, Inc., 769 F.3d 605 (8th Cir. 2014) (internal citations omitted).

III.    *Discussion*

Lovelace brings three retaliation claims under FMLA and MHRA. Mr. Lovelace brings an accompanying claim for loss of consortium. After a review of the record before me and based upon the reasons that follow, I find that all of these claims fail as a matter of law. As a result, I will grant Defendants' motions for summary judgment.

*a. Joint Employer Liability*

The parties disagree as to whether both BJH and University are potentially liable to Lovelace as joint employers. Lovelace alleges that BJH and University should be treated as joint employers because her supervisors Goldberg, a BJH employee, and Brinkley, a University employee, conspired to retaliate against her for protected activities under FMLA and MHRA. BJH asserts that it should not be treated as an employer because Lovelace was formally employed by University. For purposes of its motion, however, BJH assumes the status of joint employer and declines to request a ruling on this issue. As a result, I will proceed here by treating BJH and University as joint employers.

*b. FMLA Retaliation Claim*

Lovelace asserts that Defendants retaliated against her for taking FMLA leave. This claim fails as a matter of law. "In a [FMLA] retaliation claim, the employee alleges that the employer discriminated against her for exercising her FMLA rights." Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 923 (8th Cir. 2014) (citation omitted). Consequently, "an employer may not consider an employee's use of FMLA leave as a negative factor in an employment action." Id. To establish a prima facie case of FMLA retaliation consistent with the McDonnell Douglas framework, Lovelace must initially show: "(1) that [s]he engaged in activity

protected under the Act, (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1007 (8th Cir. 2012) (citation omitted).  Lovelace "must prove that [her] exercise of FMLA rights 'played a part' in the employer's decision" to take an adverse action. Id.  If Lovelace satisfies this initial prima facie burden, the burden of production shifts to Defendants.  Here, as a threshold matter, Lovelace fails to establish a prima facie case.  The first two elements are satisfied since Lovelace engaged in protected activity by taking FMLA leave and suffered a materially adverse employment action when she was terminated.  However, Lovelace cannot meet her burden of satisfying the third element, a causal connection between her FMLA leave and a materially adverse employment action, because intervening time and events negate any causal connection.

Courts consider temporal proximity in analyzing the causation element, and generally decline to find sufficient proximity if multiple months passed between events.  See, e.g., Sisk v. Picture People, Inc., 669 F.3d 896, 901 (8th Cir. 2012) (insufficient temporal proximity where approximately two months passed between date employee took FMLA leave and was allegedly terminated, even though termination occurred three days after returning from leave); Hite v. Vermeer Mfg.

<u>Co.</u>, 446 F.3d 858, 866 (8th Cir. 2006) (only "very close" temporal proximity is "sufficient to create an inference of the causal link;" additional evidence of causation was required where two months passed between leave and termination). In this case, approximately nine months passed between the time Lovelace took FMLA leave and her termination. Lovelace's FMLA leave began in December 2014 and she returned from FMLA leave on March 4, 2015. Lovelace alleges that Goldberg and Brinkley conspired to have her terminated beginning in July 2015. Lovelace was formally terminated on August 5, 2015. Lovelace argues that these events were sufficiently close in time so as to establish FMLA causation. However, several months passed between the time Lovelace took FMLA leave and her termination. Lovelace's alleged causal link is too temporally tenuous to establish a connection between the protected conduct and the adverse employment action. As a result, Lovelace must present additional evidence demonstrating a genuine factual issue as to FMLA retaliation. <u>See, e.g.</u>, <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc); <u>Hite</u>, 446 F.3d at 866.

Lovelace focuses her FMLA retaliation argument upon temporal proximity, without sufficiently enumerating additional reasoning or evidence to demonstrate causation. While Lovelace suggests that the record supports her position, she insufficiently enumerates factual allegations mostly based upon her own self-

serving testimony. See Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996) (In determining whether there are genuine issues of material fact to defeat a summary judgment motion, the "district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). Lovelace fails to establish a genuine issue of material fact connecting her FMLA leave to her termination, which appears to have been caused by her own intervening performance and behavior.

Considering the record as a whole, the evidence demonstrates that Lovelace was terminated for unrelated intervening non-retaliatory reasons. Defendants proffer several legitimate nondiscriminatory reasons for their actions, including Lovelace's consistently poor performance and behavior. More specifically, Defendants assert that Lovelace was terminated as a result of the incident on July 31, 2015. During this incident, Lovelace failed to accept criticism, yelled at a supervisor, and disrupted her co-workers. Although Lovelace acknowledges that this incident occurred and was Defendants' stated purpose for termination, she appears to indicate that the termination was pretextual. For example, Lovelace points to allegedly conspiratorial communications between Brinkley and Goldberg. Lovelace also promotes a theory of cat's paw liability, arguing that Goldberg and

Brinkley used Barczewski as a dupe to trigger her termination.[2]  Goldberg and Brinkley may not have liked Lovelace, and may have made inappropriate comments at times.  However, Lovelace does not sufficiently demonstrate how Defendants' explanation was pretextual or that Defendants exhibited discriminatory animus, particularly in light of overwhelming evidence that she performed poorly and behaved inappropriately in the workplace.  Lovelace could not indefinitely insulate herself from discipline by taking FMLA leave or by making complaints to human resources. See Ebersole, 758 F.3d at 923-4 ("[I]f the employer demonstrates that it would have terminated the employment had the employee not exercised her FMLA rights, then the employer faces no liability."). On the whole, Lovelace has not satisfied her burden of showing that she was fired in retaliation for taking FMLA leave.  As a result, Lovelace's FMLA retaliation claim fails as a matter of law.

   *c.  MHRA Retaliation Claims*

   Lovelace brings race and disability retaliation claims under the Missouri Human Rights Act ("MHRA").  The MHRA prohibits employers from

---

[2] The cat's paw analysis applies where "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Cherry v. Siemens Healthcare Diagnostics, Inc., 829 F.3d 974, 977 (8th Cir. 2016) (internal citations omitted).  This analysis is irrelevant here, given the lack of a discriminatory employment action.

discriminating against individuals because of enumerated categories including race and disability.  <u>See</u> Mo. Rev. Stat. § 213.055.1.  Employers may not retaliate against employees who opposed unlawful practices, reported a violation of law, or "filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to [the MHRA]." Mo. Rev. Stat. § 213.070.  "Under the MHRA, a plaintiff alleging retaliation must meet three requirements: (1) the plaintiff complained of an MHRA-prohibited activity, (2) the employer took an adverse employment action, and (3) a causal connection exists between the complaint and adverse action."  <u>Shirrell v. St. Francis Med. Ctr.,</u> 793 F.3d 881 (8th Cir. 2015); <u>Daugherty v. City of Maryland Heights,</u> 231 S.W.3d 814 (Mo. 2007) (en banc) (courts evaluating MHRA claims should look to both Missouri law and federal employment discrimination law that is consistent with Missouri law).  The plaintiff in a MHRA claim "need not show that retaliation was a substantial or determining factor in the employment decision; rather, proving a causal connection between the complaint and the adverse action depends on showing that the complaint was a contributing factor in the adverse action." <u>Cosby v. Steak N Shake Operations, Inc.,</u> Not Reported in F.Supp.3d, 2014 WL 7021766 (E.D. Mo. 2014) (internal quotation omitted).  "A retaliation claim is not conditioned on the success of the underlying discrimination or harassment claim." Soto v. Costco Wholesale Corp., 502 S.W.3d 38 (8th Cir. 2016) (citation omitted).

"The only issue is whether the person making the complaint had a reasonable good faith belief that there were grounds for the claim of discrimination." Id.

Lovelace complained to human resources representatives concerning her treatment with respect to surgery accommodations following her return from FMLA leave and for being labeled a racist. She asserts that these activities invoked MHRA retaliation protection because they concerned race and disability discrimination and she was terminated at least in part due to her complaints. Defendants assert that Lovelace is not entitled to MHRA protection because she was not retaliated against for engaging in any protected activity and any race and disability-related complaints did not contribute to her termination. With respect to both MHRA claims, Defendants also argue that to the extent Lovelace complained to her supervisors about race and disability related matters, she was impermissibly attempting to insulate herself from further disciplinary action or discharge. See, e.g., Carrington v. City of Des Moines, 481 F.3d 1046, 1051 (8th Cir. 2007). For the following reasons, both of Lovelace's MHRA retaliation claims fail as a matter of law.

### i. Race-based Retaliation

Lovelace fails to establish a genuine issue of material fact demonstrating race-based retaliation under the MHRA. Lovelace alleges that Defendants retaliated against her for complaining about race discrimination. Lovelace, who is

Caucasian, allegedly made a racially charged comment to the effect that her African-American co-worker Butcher did not like working with white people. Lovelace asserts that her supervisors falsely accused her of being a racist following this incident and retaliated by terminating her after she complained to human resources. It is unclear how Lovelace could have a reasonable good faith belief that her race-related comments would entitle her to protection. "Missouri precedent interpreting discrimination on the basis of race are confined to evaluating whether an *employer's* conduct constituted discrimination of an employee because of the color of his skin, as opposed to the substance of the employee's beliefs (accurate or inaccurate) on issues relating to race." Shore v. Children's Mercy Hospital, 477 S.W.3d 727, 735 (Mo. Ct. App. W.D. 2015) (internal quotations and citations omitted) (Summary judgment on MHRA claim was proper where employee alleged that he was retaliated against for complaining to human resources after his supervisor accused him of being a racist.). Lovelace never alleges, either directly or indirectly, that she was discriminated or retaliated against because of *her* race.

Lovelace further fails to demonstrate how her complaints about being labeled a racist contributed to her termination. As discussed with respect to the FMLA claim, Defendants argue that Lovelace was terminated for intervening non-discriminatory reasons, i.e., her poor performance and behavior. Lovelace briefly

suggests that a causal connection between the racism allegations and her termination exists because she was terminated shortly after complaining to human resources and because Goldberg and Brinkley conspired against her. However, Lovelace does not show how her complaints about the racism allegations specifically prompted any supervisor to take adverse action. If anything, the manner in which Lovelace complained about being labeled a racist despite the willingness of her supervisors to let the matter rest provides further confirmation that she consistently behaved inappropriately in the workplace. Lovelace cannot prevail on her race-based retaliation claim under the MHRA.

### ii. Disability-based Retaliation

Lovelace fails to establish a genuine issue of material fact demonstrating disability-based retaliation under the MHRA. Lovelace alleges that Defendants retaliated against her for seeking a disability accommodation. She asserts that she sought an accommodation because she had temporary work restrictions upon returning from FMLA leave and she complained to human resources representatives concerning these restrictions. However, Lovelace does not actually allege that she was disabled, nor does she provide any evidence demonstrating that she made any request or complaint related to disability accommodations. Lovelace's complaints to human resources concerned her temporary post-surgery work restrictions, not disability accommodations. See Samuels v. Kansas City Mo.

School Dist., 437 F.3d 797, 803 (8th Cir. 2006) ("Evidence of general temporary work restrictions, without more, is insufficient to constitute a disability."). As a result, Lovelace did not engage in the protected activity of complaining of unlawful disability-based discrimination. It is unclear how Lovelace could have a reasonable good faith belief that there were grounds for a disability discrimination claim if she knew she was not disabled and was not complaining about disability accommodations, as she has acknowledged.

Moreover, Lovelace fails to show how any complaint concerning her post-surgery restrictions contributed to her termination. As is discussed above, Defendants argue that Lovelace was terminated because of intervening non-discriminatory reasons, i.e., her poor performance and behavior. Lovelace briefly suggests that a causal connection between the alleged disability retaliation and her termination exists because she was terminated shortly after complaining to human resources and because Goldberg and Brinkley conspired against her. However, Lovelace does not provide evidence demonstrating that her complaints about temporary restrictions contributed to any adverse action by Defendants. Conversely, the record suggests that she was terminated for entirely different reasons. Lovelace cannot prevail on her disability-based retaliation claim under the MHRA.

*d. Loss of Consortium*

Mr. Lovelace's loss of consortium claim fails as a matter of law.  Defendants assert that a derivative loss of consortium claim cannot be predicated on statutory claims under FMLA and MHRA.  See, e.g., Franz v. Kernan, 951 F.Supp. 159 (E.D. Mo. 1996) (spouse may only bring a loss of consortium claim in context of state tort claim; defendants were entitled to judgment as a matter of law on the loss of consortium claim under the MHRA and various federal statutes because claims did not constitute "underlying tort."); Schulte v. Consol. Freightways Corp. of Delaware, Not Reported in F.Supp. 3d, 1994 WL 912944 (E.D. Mo. 1994) (no relief could be granted for loss of consortium claim where there was no underlying tort).  Moreover, the loss of consortium claim is not actionable because Lovelace's predicate claims have failed.  Under Missouri law, "[l]oss of consortium is a derivative claim that arises out of the original injury to the spouse."  Bosch v. St. Louis Healthcare Network, 41 S.W.3d 462, 465 (Mo. banc. 2001); see also Dunham v. City of O'Fallon, 945 F.Supp. 1256, 1263 (E.D.Mo.1996), aff'd, 124 F.3d 207 (8th Cir.1997) (internal citation omitted) ("[A] spouse cannot recover for loss of consortium if the other spouse has no valid claim for personal injuries.").  Because I will grant summary judgment for Defendants on Lovelace's FMLA and MHRA claims, Mr. Lovelace cannot prevail in his loss of consortium claim.

For the foregoing reasons, and based upon the record before the Court, I will grant Defendants' motions for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Washington University's Motion for Summary Judgment [35] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Barnes-Jewish Hospital's Motion for Summary Judgment [41] is **GRANTED**.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 13th day of November, 2017.